Samuel D. Leidesdorf, as Trustee in Bankruptcy of Brody & Funt Co., Inc., Respondent, *v.* Norwich Union Fire Insurance Society, Ltd., and Others, Appellants.

First Department, November 29, 1929.

*Almond D. Fisk* of counsel [*Avery, Taussig & Fisk*, attorneys], for the appellants.

*Bernard Hershkopf* of counsel [*I. Gainsburg*, attorney], for the respondent.

Martin, J. Brody & Funt Co., Inc., was the alleged owner of a large amount of skins said to have been destroyed by a fire which occurred on the afternoon of June 27, 1925, in the fur dressing establishment of the Leipzig Fur Dressing Co., Inc., at East Norwalk, Conn. Thereafter Brody & Funt Co., Inc., went into bankruptcy; the plaintiff was appointed trustee and was substituted as plaintiff in the actions brought to recover the alleged loss. Several other claimants have commenced actions against insurance

companies to collect on policies of insurance because of losses alleged to have occurred in the same fire.

The Leipzig Fur Dressing Company was organized by Samuel Adelman, one Setloff and Isaac Schaffer, two of whom were witnesses for the plaintiff and upon whose testimony the plaintiff recovered. The place of business was in an old wooden structure, rented by the fur dressing company at a rental of thirty dollars a month.

By the terms of the insurance policies the plaintiff was required to prove that the skins claimed to have been destroyed were in the premises at the time of the fire.

It is suggested that the fire was the result of arson committed for the purpose of destroying all evidence of the fact that the skins which should have been in the premises were missing, and permitting a recovery on the insurance policies, upon the theory that the skins had been destroyed by fire.

The principal witness for the plaintiff was a man named Isaac Schaffer. This case rests almost entirely upon his testimony. He testified that he was known in the business as the "outside man;" that he made contracts with and received orders for the dressing of skins from several New York merchants. In each instance, after obtaining the order he says he counted the skins and sent them to the fur-dressing company's establishment at East Norwalk, where he afterwards saw the skins and in some instances recounted them. One of his associates testified that he saw some of the skins in the premises and performed work thereon.

Thornton Olsen, a truckman, who had been doing the trucking for the Leipzig Fur Dressing Company, was called as a witness by defendants and testified that he was in the trucking business at No. 31 Hope avenue, East Norwalk, Conn.; that he had been employed by the Leipsig Fur Dressing Company as truckman; but he did not work for the company during the three weeks preceding the fire, except to take the furniture of Samuel Adelman, of the Leipsig Fur Dressing Company, from No. 10 Elizabeth street, South Norwalk, Conn., to an address on Southern boulevard, Bronx, New York city. No other truckman was called by the plaintiff to show that any skins had been taken to or removed from the premises in question.

The fire occurred at about one-five o'clock on Saturday afternoon, June 27, 1925, after all the employees and the owners had left the premises for the day. The three owners left at the same time. They lived in New Jersey and say they left the factory for home at about noon; that after paying off several of the employees, they walked about a mile to the station, but were unable to say on what train they departed. It developed that only two employees were

working on that day and only three employees had been working during the previous week.

Before they boarded the train the fire alarm had been sounded, but it does not appear that they heard the alarm. The fire company responded and in a short time extinguished the fire with very little damage to the building, as shown by the photographs in evidence.

The witness Adelman testified that he frequently went to the place of business on Sunday to prepare the work for Monday; that following that custom he left his home in New Jersey and went to East Norwalk on Sunday the day after the fire; that when he reached the railroad station after alighting from the train he was told about the fire by a former employee. He went to the factory but did not go into the building, and accounted for his indifference by saying he was afraid to go into the building. He further testified that he observed a number of skins lying around the building and in the fields nearby; that he did nothing whatever to save or protect these skins or any property in the building, but returned to New Jersey and informed his associates of the fire.

On Monday morning, before going to see the loss sustained by reason of the fire, the owners of the factory spent their time notifying the owners of skins that there had been a fire, without knowing its extent, except as stated by Adelman who was present at the factory on Sunday.

They called on Brody & Funt Co., Inc., the alleged owners of the largest number of skins, and that firm immediately called up their fire insurance brokers, and Dave Funt went to the Leipzig Fur Dressing Company's factory at East Norwalk. Brody & Funt Co., Inc., also arranged with Goldstein & Company, fire insurance adjusters, to look after their loss, and a representative of that firm, William D. Dubin, went to East Norwalk. Dave Funt testified that after the fire he saw several thousand of their skins marked " B. & F." in the premises.

On Monday following the fire, when the witness Adelman and his two associates went to the factory, there were no furs outside the building or in the fields. On the subject of furs lying on the ground outside of the building, the witness Adelman's testimony is not only wholly uncorroborated, but is contradicted by at least five other witnesses. Although he testified to the numerous skins lying outside the building on Sunday afternoon, he admitted that on the following Monday morning there were no skins anywhere outside of the building.

William D. Dubin, a witness who had been employed to adjust the plaintiff's loss, in addition to giving other important testimony,

testified to the number of skins on the premises, and his testimony was corroborated by several witnesses, particularly Irving Funt, who was asked by the court: "Q. Did Dubin count them jointly with the salvage company? A. With the salvage company, yes."

The attorney for Brody & Funt Co., Inc., testified that on Monday, June 29, 1925 (although Mr. Funt evidently did not reach East Norfolk until the afternoon of that day), he was employed by Mr. Funt to go with him to see Dr. Perdue, health officer of the city of Norwalk, and Mr. Funt requested Dr. Perdue to issue an order condemning the skins as a menace to health. This hasty effort to have the skins condemned before the insurance representatives were given an opportunity to visit the premises and investigate the loss and within two days after the fire, with a Sunday intervening, would indicate that there was something to conceal.

The plaintiff's witness, Mr. William D. Dubin, the representative of the firm of fire adjusters employed by Brody & Funt Co., Inc., testified in detail about the contents of the premises. His testimony practically destroyed the plaintiff's case. He testified as follows: "Q. Will you tell the Court and jury just what these men did while you were working with them and making a check of the furs? A. Mr. Wagner asked me — Mr. Gainsburg: Objected to, any conversation with these men. A. (Continued.) Well, Mr. Riley handled the furs, wherever they were situated. If they were on the table he counted them. Mr. Wagner asked — Mr. Gainsburg: Objected to, any conversation had by Wagner. A. (Continued.) Mr. Riley handled the furs and counted them and Mr. Wagner checked the count. Q. What part did you take in the process? A. I tallied both of them. Q. Checked against both the checking of the count and the count itself? A. Right; as they handled anything and counted it, *I was right there to watch it.* Q. I think the jurors would like to know how thoroughly these men went through those premises, and I want to know a little more in detail; I want you to go a little more in detail into that; I want to know how these men went around doing their work? Mr. Gainsburg: I object to the preliminary part of the question. Let him ask a question and not make a speech. By the Court: Q. Answer the question. A. After examining the skins that were on the table, counting the skins on the table, and counting those that were in the piles on the floor, they went through the entire second floor, dug underneath boxes and searched underneath the debris and found a number of skins that were overlooked by Mr. Funt on the first visit that I made. Q. In other words, was the preliminary count that you made a count of a listed number of skins that they found? A. Yes, sir. * * * By the Court: Q. Did they count

all the skins? A. They counted all the skins on the premises. By Mr. Fisk: Q. Everything that was there? A. Everything they could find."

He then testified that in the whole premises there were only 5,998 skins. One of the exhibits in the case sets forth the number of skins and a description thereof. It is claimed there were 26,494 skins in the factory, and in addition seven bales of skins, the contents of which had not been counted. The complete absence of proof with reference to the contents of the bales of skins has not been accounted for by any of the plaintiff's witnesses.

The plaintiff then offered expert witnesses to prove values. These experts did not see the skins but assumed they were firsts and seconds and set a value thereon.

The defendants then offered as witnesses the two men who counted all the skins on the premises and they agreed with the plaintiff's witness, Mr. Dubin, that there were only 5,998 skins in the whole premises. They described not only the method of counting but the manner in which this count was checked with that of Mr. Dubin, and signed by Schaffer and Adelman, two of the owners of the factory.

On this subject the witness Wagner testified as follows: " Q. Did you do some work in those premises in the way of counting merchandise there? A. Yes, sir, I counted some lots, that is, helped to count some lots with my man, Mr. Riley, who was with me, who counted most of them. Q. I wish you would tell us who was there doing any work, or taking part in this count at the time you started in to work? A. Mr. Riley and myself. Q. Was there anybody else there, Mr. Wagner? A. Yes, from Mr. Goldstein's office, Mr. Dubin, from Goldstein's office, was there, and also Mr. Funt, I believe his name is, one of the assured, and also one or two men of the Fur Dyeing and Dressing Company were there. Q. Do you remember who those men were, their names? A. Yes, I do. Q. Will you give them to me? A. I believe one of the men's names was Adelman and another one was Schaffer. Q. Did they remain around on the premises doing some work and helping in some way with this count? A. They were standing by and seeing that the merchandise was counted in the proper way. * * * Q. Do you remember where you started in to count? A. Yes, the first floor, on the grade or first floor. Q. At the end of the day's count did you make up an inventory or list of the goods you had counted? A. As soon as I counted one lot I would enter it right into the inventory. Q. I show you a document, which has been marked Exhibit K for identification, and I ask you if that document is in your handwriting (handing to the witness)?

A. Yes, sir. Q. Is that the list you have reference to in your testimony just given? A. Yes, sir. Q. Now, as the day went along and you kept on making the count, did you find furs in the various parts of the building? A. Yes, sir. Q. Will you tell us where? A. Found two different kind of furs down on the grade floor, or first floor, as I would call it, and the balance up on the second floor of the building. Q. In the list that you made there, did you mark certain of the furs that you counted by lot numbers? A. Yes, sir."

The defendant offered three expert witnesses as to value. All three witnesses went to the premises and made a personal examination of the goods. Milton Schreiber, a fur merchant, testified that he made a thorough examination of the skins on the premises with David Steiner and Julius Morse, also fur merchants.

The witness Schreiber testified as follows: " Q. You said something about lot 3, or started to say something? A. Yes. Q. Will you tell us about that lot? A. Supposed to be 862 foxes. They consisted of South American foxes, Turkish foxes, Australian foxes, mostly rejects. Q. What do you mean by rejects? A. Threes and fours. Q. How did they compare in quality with ones and twos? A. No comparison. Q. You mean no comparison in what way? A. As to value. Q. Are they better or worse? A. Much poorer. Q. Than ones and twos? A. Yes, sir. Q. Are they better or worse? A. Worse. Q. Were the furs in a condition to enable you to distinguish the various grades of furs? A. Yes, sir. Q. Going back, please, to lot 3, kindly advise us on that. Tell us what kind of skins they were, and in addition to that I want you to state what, in your opinion, was the value of those furs, the sound value? A. $2.50 per skin. Q. That would be $2.50 each? A. Yes, sir. Q. What was the grade of those furs? A. Threes and fours, mostly rejects. Mr. Gainsburg: That is No. 3, the same as he testified to before? Mr. Fisk: Still on lot 3. Q. Now, in that lot No. 3, did you find any perforations in any of the skins, or any identification marks at all? A. No. Q. As a general proposition, did you, in looking through these various lots of skins that are on that list, find any identification marks on any of the skins? A. None whatever. Q. Were there any skins that had perforations stamped, ' B. & F,' indicating Brody & Funt? A. None that we examined, no, sir. Q. Did you find a single skin there — A. No, sir. Q.— with a stamp of any kind on it? A. None whatsoever. Q. Now, will you go to the next lot that you gentlemen examined, and tell us about that; tell us what you found there? A. Lot No. 4, containing 400 nutria skins, as per schedule; they were mostly summer caught and damaged. By the

Court: Q. What do you mean by summer caught? A. Caught in the summer months, and have very little hair or wool on them. By Mr. Fisk: Q. Now, those skins you have just spoken of, in lot No. 4, I want you to state to the Court and Jury whether or not, when you say they had very little fur on them, your testimony relates to the character of the skins, or whether it relates to the fact that the fur has been burned off it? A. No, it relates to the skin itself; there were very few skins burned. Q. What was the next lot you went to? A. Do you want the value of the other lot? Q. Yes, give us the value on the other lot. A. $2 per skin. Q. You mean $2 a piece? A. Yes, sir. Q. The next one? A. Lot No. 5, contained as per schedule, 1989 raw squirrels. They were mostly pocket squirrels. Q. Does a pocket squirrel indicate a squirrel of some particular shape? A. Yes."

On the question of identification of skins, plaintiff's witness testified as follows: " Q. Did Mr. I. Funt tell you whether he was able to identify any of their merchandise? A. He was trying to identify it, but he was at a loss, on account of the other gentlemen with him claiming that the merchandise looked like theirs."

The defense then offered a handwriting expert to prove by opinion evidence that the book which Schaffer testified contained an accurate record of the skins received at the premises and those that were finished and returned was not made up from time to time as stated by the witness Schaffer as the goods were received and shipped out to the owners, but was all made at one time. The court here erred in refusing the offer in evidence of part of the book to show that all the entries were similar and made at the same time.

Adjoining the premises where the fire occurred was the place of business of a man named Streb. He had been in business at this same place for a number of years. He testified that there were no skins of any kind lying outside of the building or in the fields when he reached his place of business early on Monday morning; that some skins had been taken over to his place of business during the fire and were taken back on the following Monday; that he went to see the result of the fire and found not more than 5,000 or 6,000 skins in the premises and that those that he examined were of a very poor quality.

A number of firemen were then placed on the witness stand and gave very important testimony. They testified that no furs or skins were thrown out of the windows or doors and none were consumed in the fire; that the skins were scorched or very wet but no skins were wholly destroyed.

It was also shown by these witnesses, several in number, that

the building contained a number of boxes said to contain skins, that the boxes were broken open by the firemen and with the exception of two were found to be empty.

The appellant contends that there were many rulings on evidence that constituted reversible error. In addition to those above referred to, a few of the rulings which cannot be sustained will be given consideration.

The court stated that it had time and again ruled that it would not allow proof of the condition of the premises before the fire or evidence to show that skins had been removed therefrom. The court in effect held that the burden of proof was on the defendants to show that the goods were not in the premises when the fire occurred; that it having been shown the goods were once in the premises the presumption was that they were there at the time of the fire.

The skins found in the premises after the fire were claimed by several alleged owners, some of whom were plaintiffs in other actions. The proof of ownership of these skins by such plaintiffs or by other claimants was held inadmissible.

We have only briefly touched upon the evidence contained in this large record. It does not require an extensive recital of that evidence, however, to show that the judgment is against the overwhelming weight of the credible evidence and that certain rulings prevented proof of facts that were material.

The judgment should be reversed and a new trial granted, with costs to appellants to abide the event.

DOWLING, P. J., MERRELL, O'MALLEY and PROSKAUER, JJ., concur.

Judgment reversed and a new trial ordered, with costs to the appellants to abide the event.